COMMONWEALTH vs. ELMER SYLVESTER.

Essex. February 17, 1982. — March 30, 1982.

Present: Brown, Rose, & Kass, JJ.

*Practice, Criminal,* Trial of indictments together, Remark by prosecutor, Fair trial, Comment by judge. *Judge. Unnatural and Lascivious Act.*

Nine indictments charging a defendant with related offenses of rape of a child and unnatural and lascivious acts on a child under sixteen years of age were properly joined for trial where the incidents alleged had common particulars of location, method, and reward, and justice did not require severance by reason of possible prejudice from the cumulative effect of similar evidence on the various charges. [361-363]

Remarks by the prosecutor in his opening statement at a criminal trial, which included improper, although subtle, reference to other criminal conduct by the defendant for which he was not on trial, did not require reversal of his convictions on multiple indictments charging related sexual offenses. [364]

Intemperate and harassing comments made to defense counsel in the presence of the jury by the judge at a criminal trial, considered in the context of the entire record, were not so prejudicial as to deny the defendant a fair trial and thus did not require reversal of his convictions. [365-369] Brown, J., concurring.

INDICTMENTS found and returned in the Superior Court Department on February 11, 1980.

The cases were tried before *Keating*, J.

*Ellen A. Howard (Jane Kenworthy Lewis* with her) for the defendant.

*Dyanne Klein Polatin*, Assistant District Attorney, for the Commonwealth.

KASS, J. Elmer Sylvester was convicted on two indictments of raping a child and three indictments of unnatural and lascivious acts on a child under sixteen years of age. He was found not guilty on two counts of rape and two counts

of unnatural and lascivious acts. There are three issues on appeal, the most grave of which is whether harassing and demeaning remarks made by the trial judge within the hearing of the jury caused the trial to be unfair. We turn first to the other two issues.

1. *Prejudicial Joinder.*

The defendant made a timely motion to sever the indictments at trial. Mass.R.Crim.P. 9(d)(2), 378 Mass. 860 (1979).[1] That motion was denied and the defendant renewed the motion before the trial judge (who was not the same as the motion judge), and it was again denied.

A common thread ran through the criminal episodes: they all took place in the defendant's apartment; the friendship between the boy victims and the defendant had its genesis in a local store called Freddie's Market; the pattern of rewards for the boys was similar; and the sexual acts — fellatio — were similar. Hence, there existed a "series of criminal episodes connected together" which were "related offenses" within the meaning of Mass.R.Crim.P. 9(a)(1), 378 Mass. 859 (1979).

The defendant contends, however, that, although related, the offenses should not have been joined for trial because the crimes charged are so inherently odious that evidence as to one offense would enhance the jury's receptivity to evidence of another. That is, sexual offenses against minors would induce such revulsion among the jury that the repetition of separate charges would prevent the jurors from hearing evidence as to each episode dispassionately.

We are unwilling to construct a revulsion scale with which to weigh the anger and loathing which a particular offense may incite in jurors. Reaction to charges and evidence will, to some degree, be a function of the background,

---

[1] The motion was not supported by an affidavit, as required by the rule. Defense counsel noted this omission in her argument to the motion judge, observing that her reasons for severance did not lend themselves to an affidavit. Neither the judge nor the Commonwealth insisted upon an affidavit.

age, sex, and personal life experiences of a particular juror. It may as cogently be argued that if a crime is revolting, very little evidence of it is sufficient to ignite the feelings of a jury, while in the case of less-inflammatory offenses, e.g., larceny by false pretenses, joinder of a series of related offenses can overpower skepticism about evidence of an individual offense because of the cumulative picture which the jury receives.

Severing of related offenses for trial has not been the rule in Massachusetts. *Commonwealth* v. *Slavski*, 245 Mass. 405, 412-413 (1923). See *Commonwealth* v. *Blow*, 362 Mass. 196, 200 (1972) (which, however, stands primarily for the principle that offenses must be severed if they are not related); *Commonwealth* v. *Cruz*, 373 Mass. 676, 690 (1977); *Commonwealth* v. *Ellis*, 12 Mass. App. Ct. 612, 618-621 (1981); *Commonwealth* v. *Egan*, 12 Mass. App. Ct. 658, 665 (1981). Cf. *Sagansky* v. *United States*, 358 F.2d 195, 199 (1st Cir.), cert. denied, 385 U.S. 816 (1966) (involving related offenses by different defendants). See also Reporters' Notes to Mass. R.Crim.P. 9 (d), Mass. Ann. Laws, Rules of Criminal Procedure 132 (1979). Rule 9(d) does, of course, contemplate relief from prejudicial joinder in circumstances where justice requires. We are of opinion that those circumstances need to be more than the cumulative weight of similar evidence respecting related offenses. See *Commonwealth* v. *Gallison*, 383 Mass. 659, 672-673 (1981), in which the court observed that severance of charges is not indicated where, as here, a common course of conduct would have caused the evidence of any two incidents of sexual molestation to be admissible in connection with a separate trial of the third.

In several instances courts in other jurisdictions have articulated a theory of exceptional prejudice from the joinder of separate sexual offenses. To a palpable degree, the offenses in those cases had less in common than the offenses with which the defendant in the instant case was charged. Thus in *Coleman* v. *Superior Court*, 116 Cal. App. 3d 129, 138-139, cert. denied, 451 U.S. 988 (1981), the court held improper joinder of a rape-murder offense with two separate

charges of sexual offenses against young girls. The California court's view was that the evidence of the sexual offenses against young children was especially likely to inflame the jury, making it difficult to decide the murder charge on its evidence alone. Similar reasoning led the New York Court of Appeals to reverse, as an abuse of discretion, the joinder of indictments for promoting prostitution, endangering the welfare of a minor and a sodomy offense with an indictment charging eleven counts of sodomy with eight high school boys. *People* v. *Shapiro*, 50 N.Y. 2d 747, 754-757 (1980). Again, the court feared that the prejudice evoked by the combined prosecution of these various sex crimes would make it difficult for a jury to deliberate dispassionately on each separate offense.

Perhaps closer on their facts to the instant case are *State* v. *Washington*, 386 So. 2d 1368 (La. 1980), and *People* v. *Jackson*, 77 App. Div. 2d 630 (N.Y. 1980). In the *Washington* case, four sexual offenses against four young girls were tried together. The court noted, at 1372, that the method of assault varied with each crime, that the methods of enticement varied and, finally, that the four attacks occurred in four different places at four different times. On those facts the court expressed concern, at 1373, over the risk of the jury's cumulating evidence which would arouse their hostility, and thus held that the trial court abused its discretion in denying the motion for severance. In the *Jackson* case, the court, at 632, considered joinder of sodomy indictments against minors to be an abuse of discretion because the potential for prejudice "on charges of this type" outweighed "the convenience to the People" and because it rejected the prosecution's contention of a common plan or scheme. The court did not elucidate the manner in which the instances of sodomy were distinct.

By contrast, the incidents of molestation in the case at bar, as we have observed, shared a common locale, method and reward. To the degree the foreign cases discussed can be read for the proposition that the joinder of sexual offenses carries with it special prejudice we decline, for the reasons previously stated in this opinion, to follow them.

2. *Prejudicial Opening by the Prosecutor.*

It would have been better if the assistant district attorney who prosecuted the case had not in his opening: (a) described himself as "representing you, the people of the Commonwealth of Massachusetts" while referring to defense counsel as "representing the defendant"; (b) described his opening "like a friend telling you what a book is about before you have had the opportunity to read it"; and (c) saying, "[w]e will prove beyond a reasonable doubt that Chief [the defendant's nickname] took boys to his apartment, *including these three*, who will testify today . . . [and that *h]e met other boys* through word of mouth, boys that had gone up there before." (Emphasis supplied.)

Comment (b), taken by itself, was an innocent and unexceptionable attempt by the prosecutor to establish rapport with the jury. Only taken in combination with comment (a) could it be viewed as an effort to claim a special community of interest with the jury. We assume, however, that the jurors knew that lawyers are advocates and that the prosecutor spoke as an adversary. The judge made those roles clear on more than one occasion.

The innuendo in comment (c) that the three indictments represented only the tip of the iceberg was more reprehensible because the prosecutor knew perfectly well that evidence of other crimes of which the defendant had not been charged, let alone convicted, was not admissible, *Commonwealth* v. *Parker*, 12 Mass. App. Ct. 955, 956 (1981), absent circumstances not here present. Compare *Commonwealth* v. *Chalifoux*, 362 Mass. 811, 815-816 (1973); Liacos, Massachusetts Evidence 421-423 (5th ed. 1981). Nonetheless, the remarks, appearing essentially as modifiers to the points the prosecutor was trying to make, were relatively subtle and we agree with the judge that, in the context of an opening, they did not represent an occasion for declaring a mistrial. Had suggestive references to other crimes been made in the course of closing argument the transgression would have been more serious.

3. *Harassing and Demeaning Comments Made by the Judge in the Presence of the Jury.*

By conservative count, there were twenty-four occasions upon which the trial judge made remarks which were sarcastic, intemperate, harassing, snide or demeaning. As the entire trial lasted but three days and produced only 310 pages of transcript to the point at which the case went to the jury, those interjections constituted more than isolated phenomena. The defense has marshalled the judge's comments for our consideration. So massed they depict a reign of terror. It was not as bad as all that. During the entire proceeding there were considerable periods of civility between episodes of abrasiveness. We have appended to this opinion a summary of the judge's remarks. (That summary, of course, results again in a massing of remarks which produces a somewhat harsher flavor than when the remarks are read in the context of the entire transcript.) While some statements are no worse than words better left unsaid, others, and certainly the aggregate, are a good deal more than "a show of evanescent irritation — a modicum of quick temper that must be allowed even judges." *Offutt* v. *United States*, 348 U.S. 11, 17 (1954). Rather, there were repeated discharges of acerbity which, if they did not interfere with the fair administration of justice, added no lustre to the appearance of justice.

In *Commonwealth* v. *Sneed*, 376 Mass. 867, 869-870 (1978), the judgment was reversed because the trial judge's bias against the defendant was so obvious. That was not the vice of the remarks in the,instant case. Here, the tenor of the comments more resembled those in *Commonwealth* v. *Fitzgerald*, 380 Mass. 840, 846-847 (1980) (involving the same trial judge as the case at bar) in which the court, citing ABA Standard Relating to Trial by Jury 15-4.9 (Approved Draft 1978), said that trial judges should refrain as far as reasonably possible from making critical comments before the jury. See also *Jones* v. *Commonwealth*, 379 Mass. 607, 615 n.17 (1980) (a factually similar case in which the court observed that the same trial judge as in the case at bar was

extremely impatient); *Gauntlett* v. *Medical Parameters, Inc.*, 10 Mass. App. Ct. 88, 94 (1980) (remarks may have thrown the weight of the judge's opinion in the scales against the defendant); *Commonwealth* v. *Mosby*, 11 Mass. App. Ct. 1, 16-17 (1980) (criticism of counsel in open court creates danger that the judge disfavors the attorney and, inferentially, the position the attorney represents); *Adams* v. *Yellow Cab Corp.*, 12 Mass. App. Ct. 931, 932 (1981) (harassment of counsel reversible error).

This is not to say that a trial judge must be a bland arbiter. The trial judge has the job of seeing that the trial does not get out-of-hand. *Commonwealth* v. *McLaughlin*, 352 Mass. 218, 227, cert. denied, 389 U.S. 916 (1967). A trial is not a croquet match and, of course, flare-ups will occur. It is a question of quantity and quality. A ruling or an admonition may be forceful, stern and to the point without being snide. Much depends, also, on the provocation which counsel give. See e.g., *Commonwealth* v. *McLaughlin*, *supra* at 227. Here, counsel gave relatively little provocation. Questioning of witnesses was not notably discursive and the demeanor of counsel was respectful. Indeed defense counsel, who bore by far the brunt of the judge's adverse comments, was resourceful, cool and courteous under fairly heavy fire. She was neither goaded into remarks she would have been sorry for nor cowed into abandoning positions she took on behalf of her client.[2]

It is one thing to regret the manner in which the judge conducted the trial, but quite another to conclude that it was so prejudicial as to constitute reversible error. See *Olson* v. *Ela*, 8 Mass. App. Ct. 165, 166 n.1 (1979), and cases cited. Among the more serious episodes were the following:

---

[2] The judge made some particular vitriolic remarks to defense counsel at side bar out of the hearing of the jury. While we regret those comments, as well as those made within the hearing of the jury, we do not think they raise questions of reversible error because counsel did not appear to be thrown off balance by them.

Q. [by defense counsel] On June 26th, on your way to Lowell, did you receive some information about Wallie A.?

[Although the government made no objection, the judge interjected of his own accord within the hearing of the jury.]

THE COURT: You know, Ms. Lewis, for a girl [*sic*] that objected all through to leading questions by the Government, I think they've been very patient with you, because you are testifying, and he's confirming what you say, and that is a classic definition of a leading question. Stop it. I'll note your objection and your exception. Now, start asking questions the way you should.

Ms. LEWIS: Would you note the defendant's objection again, Your Honor?

THE COURT: To what?

Ms. LEWIS: To your comment, Your Honor, respectfully.

THE COURT: Get a question to the witness.

*              *              *

Q. What happened next?

A. [by the defendant] I didn't sign the card.

THE COURT: All right. He didn't. I'm sorry.

A. So, the other officer told me . . . .

[Although the government made no objection, the judge interjected of his own accord within the hearing of the jury].

THE COURT: I am not going to let you let him spill out narrative material here about self-serving statements about what he did in the police station. There is a way to try this case. Get to it.

*              *              *

Most testimony of defendants is likely to be self-serving. There was no call to editorialize in this fashion about what the defendant had said, but the judge did not impugn the defendant's credibility. Compare *Commonwealth* v. *Sneed*, 376 Mass. at 873.

The final wrangle occurred during defense counsel's closing argument. Counsel was commenting on reasonable doubt when the judge interrupted as follows:

> THE COURT: Ms. Lewis, are you going to leave me anything in the charge? So far you haven't discussed the facts. This is the time to summarize facts. So far you have discussed law.

Counsel then commented on the presumption of innocence. The judge interrupted as follows:

> THE COURT: If you don't get to the facts, I'm going to have you sit down, and you will waive your argument. Now, let's get to summarizing the facts.

There was nothing wrong with counsel's trying to put the facts in the context of their legal setting and the judge's interruptions were uncalled for. Counsel was not distorting the case. Yet, what the judge said indicated no bias against the defendant. A reprimand of defense counsel when she said at the close of her argument, "Elmer Sylvester is not guilty," was in order.

Perforce our discussion has focused on what went wrong in the trial. On balance, however, we do not think the judge's comments, in the context of the entire record and thanks in fair measure to defense counsel's poise, were so prejudicial as to deny the defendant a fair trial. The disparaging comments about defense counsel, if not isolated events, were nonetheless sporadic rather than pervasive. This served somewhat to diminish the risk that the judge's criticisms of counsel would rub off on the defendant. Nor did the judge's comments display a particular bias against the defendant, thus presenting a less damaging picture than in *Commonwealth* v. *Sneed*, 376 Mass. at 870, in which

the judge's bias was so transparent. In coming to this conclusion we note that in his charge the judge took some pains to instruct the jury that they were not to draw adverse inferences against either party from sharp remarks to counsel[3] and that the jury acquitted the defendant of several counts. The jury's capacity to make discerning distinctions indicates that their minds had not been set by the judge against the defendant.

*Judgments affirmed.*


APPENDIX

[Bench Conference Remarks Not Included]

*Interchanges with Defense Counsel*

Q. [by Ms. Lewis on cross-examination] Was it a lot of times or a few times?

A. A . . . repeat that please.

THE COURT: Is that helpful to the jury? A lot of times or a few times? It doesn't mean anything does it?

         *                    *                    *

Q. [by Ms. Lewis on cross-examination] And how many times did you talk to Bob Reinertson?

A. I don't know. I can't remember.

Q. Was it a lot of times? Just once?

THE COURT: He says yes [the witness had not]. How does that help the jury, a lot?

         *                    *                    *

THE COURT: Do you object to what he said to him?

Ms. LEWIS: Yes.

THE COURT: All right. Go ahead, son. That's a new one.

         *                    *                    *

---

[3] We do not mean to say, however, that a judge can invariably neutralize prejudicial conduct by a curative instruction.

Commonwealth *v.* Sylvester.

THE COURT: All right. I'm going to allow it. It is not harmful, Ms. Lewis. This is how he got involved. I don't see how it hurts the defendant. There has got to be some point to your objections.

*              *              *

THE COURT: No. I will let her have that.

Ms. LEWIS: Thank you very much.

THE COURT: You don't have to thank me. I only do my duty.

*              *              *

Ms. LEWIS: Your Honor, I would expect that my next witness will have rather lengthy testimony, and may we adjourn at this time for lunch?

THE COURT: I'm not hungry at all. Proceed.

*              *              *

THE COURT: Excluded. Next question. I suppose the jury can draw their own conclusions. Give them some credit, too, Ms. Lewis.

*              *              *

Ms. LEWIS: Your Honor, I am not offering it for hearsay purposes, but for the fact that the statement was made.

THE COURT: I didn't know there was such a purpose, a hearsay purpose. No, I'll exclude it. Save your rights.

*              *              *

THE COURT: I am going to exclude it.

Ms. LEWIS: Note the defendant's objection.

THE COURT: I don't have to do that anymore. It is done by the reporter.

*              *              *

Q. [by Ms. Lewis] On June 26th, on your way to Lowell, did you receive some information about Wallie A.?

THE COURT: You know, Ms. Lewis, for a girl [*sic*] that objected all through to leading questions by the Government, I think they've been very patient with you, because you are testifying, and he's confirming what you say, and that is a classic definition of a leading question. Stop it. I'll note your objection and your exception. Now, start asking questions the way you should.

Ms. Lewis:  Would you note the defendant's objection again, Your Honor?

The court:  To what?

Ms. Lewis:  To your comment, Your Honor, respectfully.

The court:  Get a question to the witness.

*          *          *

Q.  And what did you think you were being brought to the police station for?

The court:  Who cares?  Excluded.

*          *          *

Ms. Lewis:  Note the defendant's objection.

The court:  Oh, yes.  I will note your objection.

*          *          *

The court:  I am not going to let you let him spill out narrative material here about self-serving statements about what he did in the police station.  There is a way to try this case.  Get to it.

*          *          *

Q.  [by Ms. Lewis].  Who came into the room — which of the three, Joey, Wallie or Louie came into the room?

(No objection to the question by the Commonwealth)

A.  Joey B. . . . . .

The court:  Is that terribly crucial or helpful to the jury?

*          *          *

The court:  Is that his statement, or yours?

Ms. Lewis:  I believe it is his, Your Honor.

The court:  You mean you want him to adopt it?  Go ahead.

*          *          *

Q.  Did he ask for these magazines?

[No objection made by the Commonwealth]

The court:  Ms. Lewis, who cares?  Will you get to the issue here which is the subject of these indictments.

*          *          *

Ms. Lewis:  I would suggest, Your Honor, that Mr. McAlary [the prosecutor] has attempted to impugn the credibility of . . . .

The court:  I am excluding it.  I am excluding it.

BROWN, J. (concurring). I concur in the majority opinion, albeit reluctantly. But for the overwhelming evidence against the defendant, and the fact that the jury by acquitting the defendant on several counts made manifest their "capacity to make discerning distinctions" in these circumstances, I would urge that the defendant be given another trial.

Appellate courts have the responsibility for reviewing prejudicial excesses occasioned by judicial error as well as prosecutorial error. Cf. *Commonwealth* v. *Earltop*, 372 Mass. 199, 206 (1977) (Hennessey, C. J., concurring). It cannot be gainsaid that "the particular danger created by [judicial] criticism in open court is the likelihood that it will 'impress the jury with the idea that [the judge] disfavors the attorney and, inferentially, the position the attorney represents.'" *Commonwealth* v. *Mosby*, 11 Mass. App. Ct. 1, 17 (1980), quoting from *State* v. *Pokini*, 55 Haw. 640, 645 (1974) (plurality opinion).

Finally, I should hasten to underscore (see note 3, *supra*) that this court should turn a deaf ear to an argument such as that advanced here by the Commonwealth that fair and competent jury instructions by a trial judge can eradicate the prejudicial effects resulting from that same judge's own conscious actions, demeaning extraneous comments and intemperate conduct.